# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH A. FRANKO, JR.
JUDITH A. FRANKO, his wife,

                 Petitioners,

           v.

AMERIPRISE FINANCIAL SERVICES, INC.
f/k/a AMERICAN EXPRESS FINANCIAL
ADVISORS, INC.,

                 Respondent.

      :    CIVIL ACTION NO. 09-CV-09

      :    Judge Padova

## ORDER

AND NOW, this _____ day of _____, 2009, upon consideration of the petition to vacate arbitration award of petitioners, Joseph A. Franko, Jr. and Judith A. Franko, and the response and cross petition to confirm award and for sanctions of respondent, Ameriprise Financial Services, Inc., it is hereby ORDERED and DECREED that the petition to vacate arbitration award is DENIED.

It is further ORDERED and DECREED that the cross petition to confirm the award and for sanctions is GRANTED. The final arbitration dated January 8, 2009 is hereby confirmed in accordance with the Federal Arbitration Act, 9 U.S.C. § 1, et seq.

It is further ORDERED and DECREED that sanctions are imposed against petitioners and their counsel.

It is further ORDERED and DECREED that petitioners and their counsel shall pay, jointly and severally, the attorney's fees and costs that Ameriprise Financial Services, Inc.

incurred in responding to the petition to vacate arbitration award as established by way of fee petition.

BY THE COURT:

_____

The Honorable John R. Padova

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH A. FRANKO, JR.<br>JUDITH A. FRANKO, his wife,<br><br>                 Petitioners,<br><br>          v.<br><br>AMERIPRISE FINANCIAL SERVICES, INC.<br>f/k/a AMERICAN EXPRESS FINANCIAL<br>ADVISORS, INC.,<br><br>               Respondent. | CIVIL ACTION NO. 09-CV-09<br><br>Judge Padova |

### RESPONSE OF RESPONDENT AMERIPRISE FINANCIAL SERVICES, INC. TO THE PETITION TO VACATE ARBITRATION AWARD AND CROSS-PETITION TO CONFIRM ARBITRATION AWARD AND SANCTIONS

Respondent, Ameriprise Financial Services, Inc. ("Ameriprise Financial"), by and through its attorneys, hereby responds to the petition to vacate arbitration award of petitioners, Joseph A. Franko, Jr. ("Mr. Franko") and Judith A. Franko ("Mrs. Franko") (collectively, the "Frankos"), and cross-petitions to confirm the award and for sanctions, as follows:[1]

## I.    INTRODUCTION:

On October 6, 2008, counsel for the Frankos wrote to NASD Dispute Resolution, Inc. to request a clarification or augmentation of the Panel's award, dated September 26, 2008, and stated:

> **Claimants wish to thank the Panel for their attentiveness through more than twenty (20) hearings sessions** in the above matter. However, to provide Claimants with an understanding, and for the professional development of their counsel (**and not for the purposes of appeal**), it is respectfully requested that pursuant to

---

[1]  American Express Financial Advisors, Inc. is the predecessor to Ameriprise Financial. For ease of the Court, all references will be to Ameriprise Financial.

> Rule 12904(f) of the NASD Code of Arbitration Procedure that the Panel, at its discretion, provide an explanation of their rationale underlying the Award.

See Exhibit "A".[2]   Having received exactly what they requested and notwithstanding the representation of their counsel, the Frankos now seek to vacate the award.  In doing so, the Frankos have asked this Court to substitute its judgment for that of the admittedly "attentive" Panel because they simply do not like the reasons the Panel provided.

This Court should summarily dismiss the petition without considering the merits because it is without proper record support.  Rather than provide this Court with the testimonial record, the Frankos have simply relied upon the "recollection" of their counsel.[3]  Although the Frankos also referenced a number of hearing exhibits in their memorandum of law (the "Memorandum"), they failed to provide a number of them to the Court.  The Frankos are wasting this Court's time because they have effectively deprived this Court the ability to properly assess the actual record, or even their counsel's "recollection".  Similarly, the Frankos' illegitimate petition has forced Ameriprise Financial to incur unnecessary expense.  This Court should deny the petition without further consideration because the Frankos' have pursued it without a legitimate basis.

Of equal importance, the Frankos have failed to address the proper standard of review under the Federal Arbitration Act.  Rather, the Frankos have focused on two common law standards that the United States Supreme Court effectively rejected in a recent decision.  Regardless of which standard of review is applied, the Frankos have not satisfied their weighty burden.  The petition is nothing more than a half-hearted effort at Ameriprise Financial's

---

[2]  The Panel did not issue the final modified award until January 8, 2009.  See Exhibit "B".

[3]  The failure to request the audio tapes from each hearing session is even more glaring considering that the Frankos requested the oral arguments conducted on September 18, 2008.  See Exhibit "C".  If the Frankos truly intended to have this Court conduct a meaningful review, they would have requested the testimonial record.

expense.  Therefore, the Court should deny the petition and grant the cross-petition to confirm the award and impose sanctions against the Frankos.

## II.    **STATEMENT OF FACTS**

The Frankos' omission of the testimonial record has left Ameriprise Financial in the untenable position of responding based upon its own counsel's best recollection.  This problem of the Frankos' making is compounded by the fact that the arbitration hearings commenced on October 16, 2007 and concluded on September 18, 2008.  Nonetheless, the foregoing statement of facts reflects counsel's best recollection of the testimonial record.

### 1.    **Before The Frankos Come To Ameriprise Financial**

The Frankos were long-standing equity investors before coming to Ameriprise Financial. Mrs. Franko, commencing in 1987, owned the following equity-based mutual funds: MFS Emerging Growth, Affiliated Fund, and the Van Kampen American Capital Fund.  Even though Mrs. Franko inherited these investments from her father, she testified that she diligently reviewed her account statements, understood that these investments could go up or down in value, and understood the potential risk of loss.  When Mrs. Franko did not receive an account statement for the MFS Emerging Growth Fund, she knew enough to contact MFS to make appropriate inquiries.

Mr. Franko was a long-time employee of Proctor & Gamble ("P&G") and invested in its employee retirement account for over twenty (20) years.  Although he had investment options, Mr. Franko invested the bulk of his retirement assets in P&G common, stock with the balance in a guaranteed investment account that paid a fixed return.  The Frankos closely followed the price of P&G stock.  The Frankos paid closer attention as Mr. Franko approached retirement in 1997. Mr. Franko knew that P&G common stock performed better than the guaranteed investment,

stating at the arbitration that "you did not need to be a rocket scientist to know that P&G stock outperformed the guaranteed investment." Mr. Franko did not like the guaranteed investment because it returned less than P&G common stock. The Frankos acknowledged that they knew P&G could go up and down in value and could lose money. The Frankos also understood the need for investment diversification to protect against the risk of loss.

In or about 1995, the Frankos attended a three-day retirement planning seminar that P&G sponsored. This seminar covered, among other topics, investing, early retirement, and how to select a financial advisor. Subsequent to attending this three-day seminar, the Frankos interviewed two financial advisors unassociated with Ameriprise Financial (one of whom they met more than once) to explore their retirement investment options. One of these financial advisors provided the Frankos with a pie shaped asset allocation model similar to those attached as Exhibits 4 through 8 of the Memorandum. In the two years leading up to Mr. Franko's retirement, the Frankos attended retirement planning seminars; not one was sponsored by Ameriprise Financial or its associated financial advisors.

Mr. Franko waited to retire until the spring of 1997, when he reached the age of 55, to preserve his P&G health insurance until he qualified for Medicare. Before Mr. Franko retired, the Frankos had a general understanding of how other P&G early retirees invested their retirement assets. Further, the Frankos understood the implication of Mr. Franko having a SEPP IRA in accordance with Section 72T of the Internal Revenue Code (the "IRC"). The Frankos knew and understood before coming to Ameriprise Financial that they would be locked into a withdrawal rate until Mr. Franko turned 59½ and that the amount of the withdrawals would be recalculated at the beginning of each year based upon the prior year-end closing value. If the

value of their investments increased one year over the other, the Frankos understood that the actual dollars withdrawn in the next year would correspondingly increase.

Immediately before he retired in 1997 and after performing over two years of due diligence, a friend recommended the Frankos to Joseph P. Krugel, Jr. ("Krugel"), a financial advisor associated with Ameriprise Financial. The Frankos first met with Krugel in April 1997.

### 2.    The Frankos' Relationship With Ameriprise Financial And Met Life

At a meeting in April 1997, Mr. Franko signed two account applications. Mr. Franko signed an IMA Application, a brokerage account used to roll Mr. Franko's P&G stock over to Ameriprise Financial. See Exhibit "D" (Claimants' Exhibit "C28").[4] With respect to this and all other account applications, Mr. Franko confirmed that Krugel read all of the questions to him and his wife and that he and his wife provided the answers. The Frankos also confirmed that they understood that Ameriprise Financial would rely on the information contained in their account applications. On the IMA application, the Frankos identified themselves as growth and income investors who were willing to accept average quality risk. The Frankos conceded that they chose not to review the completed account applications to verify their accuracy.

Mr. Franko also testified that he thought being a growth and income investor was a good thing. Mr. Franko stated that he did not want to be designated as an "aggressive" investor because that meant he would have a greater risk of losing money. Mr. Franko also confirmed that Krugel reviewed with him what it meant when Mr. Franko designated himself as an investor with an "average quality" risk tolerance.

---

[4]  All references to "Claimants' Exhibits" reference those exhibits admitted into evidence at the arbitration on behalf of the Frankos. "Respondent's Exhibits" reflect those exhibits that the Panel accepted into evidence on the part of Ameriprise Financial. With respect to all of the exhibits, the bates-labels that start with "C" reflect documents that the Frankos produced.

At the same April 1997 meeting, Mr. Franko signed an IRA Investment Application. <u>See</u> Exhibit "E" (Respondent's Exhibit "12"). Mr. Franko also designated himself as growth and income investor on this application. In addition, Mr. Franko initialed the IRA Investment Application in a number of instances to signify that he understood that his shares could go up or down in value and that dividend yields or interest could fluctuate up or down with no amount guaranteed.

At the initial meeting with the Frankos, Krugel also reviewed an April 9, 1997 proposed asset allocation model, which was based upon the work of Nobel Laureate Harry Markowitz. <u>See</u> Exhibit "F" (Respondent's Exhibit "10"). Krugel reviewed this and all other asset allocation models and financial advisory proposals (including those attached to the Memorandum among others) with the Frankos. The first page of each asset allocation model contained an "Important Message", which stated in pertinent part:

> The return and asset value forecasts in the analysis should not be used to project the performance of specific assets you may or could purchase. In addition, as with all strategies based on historical performance, past performance is no guarantee of future performance.

Exhibit "F" at 1.

The initial and subsequent asset allocation models also included a chart designated as the "Efficient Frontier". <u>Id.</u> at 3. The Efficient Frontier reflects a proposed asset allocation where risk is shown in proportion to return; the greater the risk the higher potential return. Krugel testified that the proposed asset allocation, investments and withdrawal rate were premised upon the Frankos' request to withdraw $52,000.00 a year; two years before Mr. Franko retired the Frankos earned over $51,000.00. <u>See</u> 1995 tax return attached as Exhibit "G" (Respondent's Exhibit "42"). Krugel used the asset allocation model to formulate asset allocation and investment recommendations that would allow the Frankos to withdraw their requested amount

over the twenty (20) year projected investment period without a complete depletion of their retirement assets.[5]

Mrs. Franko testified that she personally reviewed at least one asset allocation model before Mr. Franko invested with Ameriprise Financial and understood how the Efficient Frontier worked. She also confirmed that, over the years, Krugel reviewed with the Frankos, among other sections, the Efficient Frontier on each asset allocation model. Of equal significance, each projection of assets or financial forecast over the life of the proposed investment period contained the following statement: "This table is a hypothetical illustration based on assumptions made. This is not a guarantee of performance of either your illustrated mix or its component investments." See Exhibit "F" at 5, 7 and 8. The asset allocation models also included a qualified asset transfer section (which describes the funding of particular investments) and a proposed investment plan section that identifies each proposed asset class and projected historical rates of return for best and worse case scenarios over the short and long-term. Id. at 9-13 and 15-18. The asset allocation models also provided descriptions of the proposed investments in plain English, including statements of the risks associated with each investment. Id. at 19.[6] According to Mrs. Franko, Krugel encouraged the Frankos to independently review

---

[5] Throughout their relationship with Ameriprise Financial, the Frankos withdrew, on average, approximately $58,000.00. a year. Overall, the Frankos withdrew approximately $585,000.00 from their Ameriprise Financial accounts. See Exhibit "H" (Respondent's Exhibit "48").

[6] These disclosures and information appeared in the asset allocation models attached to the Memorandum as Exhibits "5" through "8". Krugel reviewed each and every model with the Frankos. Before making any investment recommendations, Krugel independently researched mutual funds to determine the best available funds from different asset classes. Krugel followed those funds and made adjustments (removing certain mutual funds and adding others to his recommended list) when certain mutual funds no longer met Krugel's criteria. Separate and apart from the information in the asset allocation models, Krugel reviewed each and every proposed investment with the Frankos before they invested, including the risks associated with those investments. Each investment had a solid track record or was a mirror image of a fund with a solid performance history. Mrs. Franko approved all investment recommendations.

the asset allocation models and contact him with any questions or comments, but they opted against doing so.

The Frankos did not begin to invest with Ameriprise Financial until June 1997. Before making any investments, Krugel reviewed with the Frankos three separate asset allocation models. Mrs. Franko acknowledged that the asset allocation models only made projections, not guarantees.[7] The Frankos confirmed that neither Krugel nor Ameriprise Financial guaranteed anything to them; instead, they only ever received projections. More important, Mrs. Franko testified that neither Krugel nor Ameriprise Financial hid, misrepresented or lied to them about anything at any time. Mr. Franko also testified that no one associated with Ameriprise Financial tried to hurt the Frankos.[8]

In June 1997, Mr. Franko began to transition his retirement assets from P&G to Ameriprise Financial. On June 4, 1997, Mr. Franko signed an application for the Strategic Portfolio Service ("SPS"). See Exhibit "I" (Respondent's Exhibit "20"). Mr. Franko again designated himself as a growth and income investor in response to Krugel's questions. Among other things, the SPS account opening documents described the account as non-discretionary. Id. at 8.[9]

The Frankos remained clients of Krugel and Ameriprise Financial until June 2006. Over the years, Krugel reviewed with the Frankos their investments and additional asset allocation

---

[7] The projections in the asset allocation models were based upon then available historical information.

[8] At the hearing, counsel for Ameriprise Financial asked Mr. Franko if anything Mrs. Franko testified to had to be corrected. He said no and that he agreed with everything Mrs. Franko said.

[9] The Frankos maintained the SPS account for mutual fund investments. The IMA (or brokerage account) was used to hold the P&G common stock that Mr. Franko rolled over to Ameriprise Financial. At the time, SPS accounts could not hold common stock. Finally, the Frankos maintained an interest bearing cash management account. The Frankos redeemed investments in the SPS account and transferred those funds to the cash management account for the Frankos' use as they saw fit.

models or financial advisory proposals on at least a yearly basis. Separately, Mrs. Franko confirmed that she reviewed their paper account statements on a monthly basis. The account statements included account values and warnings regarding market and economic volatility. See, e.g., Exhibit "J" (Respondent's Exhibit "51").[10] The Frankos opted against reading their entire account statements; instead, they only focused on the "bottom line". Mrs. Franko separately and regularly reviewed their accounts over the internet.

On average, from June 1997 through June 2006, the Frankos' asset allocation was 75/25 equity to bonds and fixed investments. If the Frankos' P&G holdings are excluded, the hearing testimony demonstrated that their average asset allocation was 68/32 of equity to bonds and fixed investments. Six months after the Frankos left Ameriprise Financial (December 2006), they moved their investments to Met Life, liquidated every position that they had with Ameriprise Financial and reinvested their money with Met Life. The Frankos maintained a 70/30 equity to bond asset allocation, even though the Frankos' Met Life account opening documents state that they would be most comfortable with a portfolio of 100% bond for average annual returns or a portfolio of 50/50 (equities to bonds) as their preferred portfolio when comparing returns to volatility. See Exhibit "K" (Respondent's Exhibit "55" at 3).[11]

Over the years of working with Ameriprise Financial, the Frankos received additional account disclosures. In May 2000, for example, the Frankos received account disclosures regarding the IMA account. See Exhibit "L" (Respondent's Exhibit "45"). Among other things, the disclosure stated: "I assume full responsibility with respect to transactions in or for my

---

[10]   The Frankos' account statements were submitted into evidence collectively as Respondent's Exhibit "51". The attached are representative examples of year-end statements and disclosures that the Frankos received.

[11]   The Frankos also represented to Met Life that they wanted an "[e]mphasis on dividend and interest-bearing securities with the possibility of some capital appreciation." See id. The Frankos further represented in their Met Life account opening documents that they were willing to accept a loss in any give one year period. Id.

account and my investment decisions. I acknowledge that trading securities carries substantial risk, that securities trading can be volatile and that investment loss may be substantial in a short period of time." Similarly, in April 2005, the Frankos received disclosures regarding the SPS account. See Exhibit "M" (Respondent's Exhibit "46"). These disclosures contained, among other items, a confirmation that the client (the Frankos) supplied or will supply information regarding their investment objections and risk tolerance. Id. at 2. The SPS disclosures further confirmed that the services of Ameriprise Financial were non-discretionary in nature. Id. Finally, the SPS disclosures warned the Frankos that mutual funds and other securities were subject to the risk of loss. Id. at 5. The Frankos did not read these disclosures.[12]

From 1997 through 2000, the Frankos were thrilled with their Ameriprise Financial accounts because they steadily increased in value notwithstanding approximately $200,000.00 of withdrawals over the same time period. After observing the market volatility from 2000 through and including 2002, Mrs. Franko contacted Krugel and specifically requested that he make the Frankos' investments "more conservative", asking that Krugel decrease their equity position and increase their bond and cash positions.

Notwithstanding the market volatility throughout the early 2000s, in February 2003, Mrs. Franko directed Krugel to purchase an additional 1,000 shares of P&G common stock, even though it was not immune from the market volatility. For example, on one day in March 2000, P&G lost approximately 50% of its value. Nevertheless, as a result of the 2003 purchase, P&G

---

[12] The Frankos' failure to read the disclosures contained in the: (i) account applications; (ii) account disclosure statements; (iii) asset allocation models; or (iv) account statements is no excuse under the doctrine of supine negligence. In Standard Venetian Blind, Co. v. American Empire Ins. Co., 469 A.2d 563 (Pa. 1983), the Court held that an insured was bound to a contractual exclusion notwithstanding the fact that the insured did not read or understand the exclusion. In doing so, the Standard Venetian Blind court stated: "[I]n the absence of proof of fraud, failure to read [the contract] is an unavailing excuse or defense and cannot justify the avoidance, modification or nullification of the contract or any provision thereof." Id. at 566 (citations omitted). The Frankos failure to read these documents further justifies the Panel concluding that the Frankos acquiesced by their conduct.

common stock ultimately represented 43% of the Frankos' entire investment portfolio. Krugel cautioned the Frankos against having such a high allocation in any one position and recommend (orally and in a financial advisory proposal) that they diversify, but the Frankos refused. <u>See</u> Exhibit "N" (Respondent's Exhibit "36"). As a result, Ameriprise Financial required that the Frankos acknowledge, in writing, their desire to maintain their P&G position. <u>See</u> Exhibits "O" and "P" (Respondent's Exhibits "34" and "35").

Mrs. Franko also religiously reviewed all transaction confirmations and, in doing so, ratified each an every transaction. In December 2003, for example, Mrs. Franko received a confirmation reflecting the sale of some P&G common stock. According to Mrs. Franko, she called Krugel and told him that she did not authorize this transaction and that Krugel offered a reversal. After speaking with Krugel in further detail, Mrs. Franko decided against the reversal and ratified the liquidation and corresponding purchase of additional mutual funds.[13]

Although the Frankos testified that they contemplated leaving Ameriprise Financial beginning in 2003 and believed that they were losing money, the Frankos remained with the company and Krugel until June 2006. At no time during their relationship with Ameriprise Financial did the Frankos complain about any service that they received. In fact, as late as October 2005, Mr. Franko confirmed to Krugel that he was satisfied with his investments and desired no changes.

---

[13]  The Panel properly found that the Frankos acquiesced (ratified) their investments in written form or by their actions. The court in <u>Merrill, Lynch Pierce, Fenner & Smith, Inc. v. Millar</u>, 274 F. Supp. 2d 701, 710 (W.D. Pa. 2003), described ratification in the investment context as follows:

> In the broker/customer context, the doctrine of ratification prohibits the customer from disavowing unauthorized transactions in his or her account when it is clear from all circumstances that the intent of the customer was to adopt as his own and for all times the acts made without authorization.

Ameriprise Financial offered the expert testimony of Paul Moulden ("Moulden") on the issues of liability and purported account losses.    Moulden testified that the investment recommendations of Krugel and Ameriprise Financial were suitable under the circumstances. Moulden further testified that the Frankos' asset allocations were proper for early retirees who were long-term growth and income investors.    Moulden highlighted the fact that the average asset allocation with Ameriprise Financial mirrored the asset allocation that the Frankos maintained within six months after leaving Ameriprise Financial and repositioning all of their investments.    Moulden further testified that the "learned treatises" that the Frankos used during his cross-examination further supported the asset allocation as Krugel recommended.    The Frankos offered no expert testimony to contradict Moulden's testimony.

### 3.    The Frankos' Memorandum Of Law

In addition to the overview of the record above, a few "evidentiary" points addressed in the Memorandum require specific attention.

The Frankos have taken issue with the withdrawal rate in their accounts, but the evidence demonstrated that the withdrawal rate was based upon the amount of money that the Frankos initially requested from their accounts ($52,000.00) and then recalculated on a yearly basis until Mr. Franko turned 59½ in 2002.    The Frankos also failed to mention that, in the spring of 2002, Mr. Franko no longer had mandatory withdrawal requirements in accordance with Section 72T of the IRC.    Immediately after the Frankos came off of the mandatory minimum withdrawal requirements, however, they redeemed an extra $50,000.00 from their accounts to assist their son with a business venture.    By doing so at the worst possible time in the market, Moulden testified that the Frankos irreparably impacted their ability to recoup any purported losses in the market upswing that began in the spring of 2003.

Commencing in 2002, Krugel also repeatedly cautioned the Frankos to decrease their withdrawal amounts, but the Frankos ignored this advice. Despite acknowledging that they had to decrease their rate of withdrawals as early as 2002 and that they began to receive social security benefits in 2002, the Frankos did not decrease their rate of withdrawals until 2004. As a result, the Frankos withdrew approximately $93,000.00 in 2002 and $61,000.00 in 2003, respectively. See Exhibit "H" (Respondent's Exhibit "48").

The Frankos also contend as a "fact" that Krugel modified the Frankos account profile in April 2005 from moderate conservative to moderate aggressive. The "modification" of the Frankos' account profile was hotly contested during the hearing. Putting aside the circumstances surrounding the change in account profile, on or about May 2, 2005, Ameriprise Financial forwarded separate letters to Mr. and Mrs. Franko confirming their account profile reflected them as "moderate aggressive" investors. See Exhibits "Q" and "R" (Respondent's Exhibits "50" and "57"). Importantly, the covering letter stated: "Please carefully review this summary. **If the information is correct, no action is needed on your part.**" Id. Although the Frankos received the letters and retained them for their records, they opted against reviewing them.

The Frankos also relied upon Ameriprise Financial account guidelines from 2002, five years after the majority of the investment recommendations at issue, for the proposition that the Frankos' investments did not fall within the "moderate conservative" guideline. Importantly, both Krugel and Moulden testified without contradiction that the guidelines were just that, not hard and fast rules because an asset allocation always depends upon individual circumstances. Further, six months after the Frankos transferred all of their assets to Met Life, their new asset allocation almost mirrored their average asset allocation with Ameriprise Financial. The

Frankos' proffered "learned treatise" further supported the propriety of the average asset allocation with Ameriprise Financial. See Frankos' Exhibit "12" (Claimants' Exhibit "68" at 2).

Finally, the Frankos suggested that their out-of-pocket losses were $76,393.00 and state that Ameriprise Financial stipulated to this amount. This representation is half-true but mischaracterizes the record. Ameriprise Financial stipulated to the fact that the **gross losses** for the SPS account totaled $76,393.00. Importantly, Moulden testified, as reflected in his complete profit and loss analysis, that the **net loss** on the SPS account was $40,447.00. See Exhibit "S" (Respondent's Exhibit "59" at Tab C). Moulden further testified that this net loss had to be offset against the gains, dividends and/or interest in the IMA account in the amount of $33,655.00 and money market account in the amount of $4,961.00 for a total net loss of $1,831.00, or 2% of the Frankos' initial investment. Id. (Tab C + Tab A + Tab B). At the hearing, Moulden further supplemented his profit and loss analysis to take into account certain additional gains from the Frankos' P&G holdings in the IMA account subsequent to the time period covered in his report. By completing that analysis, Moulden testified, without contradiction, that the Frankos' investments actually gained approximately $40,000.00.[14]

At the close of the hearing, the Frankos were asked, as is standard in NASD Dispute Resolution, the following: "Do the parties have any other issues or objections that you would like to raise that you have not previously raised?" The Frankos raised no issues or objections, and the Panel closed the hearing.

---

[14]   The Frankos also incorrectly claim that Moulden supported their "well-managed portfolio" theory. Moulden only testified that the theory has been recognized, but that it had no application in these proceedings because the Frankos' analysis was fundamentally flawed. Moreover, Moulden testified that the analysis prepared by one of his partners only reflected an alternative asset theory prepared at the request of the Frankos' counsel and that neither Moulden nor his partner have testified in support of the "well-managed portfolio" theory.

### III.    **LEGAL ARGUMENT**

#### A.    **Standard Of Review**

As an initial matter, the Frankos have never identified or argued the proper standard of review under the Federal Arbitration Act (the "FAA"). Instead, the Frankos have improperly selected two common law standards outside of the FAA. In view of the Frankos' deficiencies, Ameriprise Financial is compelled to set forth the appropriate and complete standard of review.

It is well-settled that review of an arbitration award is "extremely deferential", "severely limited" and vacatur is only appropriate in "exceedingly narrow" circumstances. See Sherrock Brothers, Inc. v. DaimlerChrysler Motors Co., LLC, 2008 U.S. App. LEXIS 282 (3d Cir. January 7, 2008); and Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co., et. al, 868 F.2d 52 (3d Cir. 1989). Indeed, there is a "strong presumption in favor of the arbitration award. Mere disagreement with the arbitrator's decision or a belief that the arbitrator committed a serious error is insufficient to vacate or modify an award." AAMCO Transmissions, Inc. v. Sally, et al., 2008 U.S. Dist. LEXIS 102502 (E.D. Pa. December 18, 2008) (citations omitted). "The presumption is in favor of the award and **the award should be upheld so long as the arbitrator's conclusions are 'barely colorable'**." Clarendon National Ins. Co. v. NCO Financial Systems, Inc., 2004 U.S. Dist. LEXIS 7098 (E.D. Pa. April 8, 2004) (emphasis added) (citations omitted). "As long as there is some basis for the arbitrators' decision, no matter how 'slender' that basis may be, the award must be confirmed. **'All that is required is some support in the record.'** Under these standards, **a reviewing court should decline to sustain an award 'only in the rarest case'.**" The Edward Mellon Trust v. UBS PaineWebber, Inc., et al., 2006 U.S. Dist. LEXIS 80922, *8 (W.D. Pa. November 6, 2006) (emphasis added) (citations omitted).

Section 10 of the FAA articulates the grounds for vacatur as: (1) where the award was procured by corruption, fraud or undue means; (2) where an arbitrator evidenced partiality or corruption; (3) where the arbitrator is guilty of misconduct; and (4) where the arbitrator has exceeded the scope of authority.  See Sherrock Brothers, 2008 U.S. App. LEXIS at *3 (citing 9 U.S.C. § 10(a)(1)-(4)).[15]  In the Memorandum, the Frankos never addressed these enumerated grounds.  Instead, the Frankos focused solely on judicially created "additional grounds" (complete irrationality and manifest disregard of the law), even though the United States Supreme Court recently limited the ground for vacatur to those enumerated in the FAA.  See Memorandum at 15 and 16.

In Hall Street Associates, LLC v. Mattel, Inc., 128 S.Ct. 1396 (2008), the Supreme Court held that the FAA provides the exclusive grounds for vacatur or modification.  Id. at 1403.  Hall Street argued for a contractual basis for vacatur or modification on the premise that courts have recognized "manifest disregard of the law" as an additional basis for vacatur.  The Hall Street Court rejected this argument because of the inherent uncertainty regarding whether "manifest disregard of the law" actually represented an independent basis to vacate or modify an award.  Id.  In doing so, the Court in Hall Street refused to accord "manifest disregard of the law" the significance that Hall Street requested.  Id.  The Hall Street Court further reasoned:

> Instead of fighting the text, it makes sense to see three provisions, §§ 9-11, as substantiating a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straight-away.  Any other reading opens the door to the full-bore legal and evidentiary appeals that can 'rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process'.

---

[15]  The court in Sherrock Brothers recognized manifest disregard of the law as a judicially created basis to vacate an award.  Id.  In addition, the court in Mutual Fire, Marine & Inland Ins. C. Norad Reinsurance Co., 868 F.2d 52,56 (3d Cir. 1989), recognized complete irrationality as another common law basis to vacate an award.

Id. at 1404 (citations omitted); see also Ramos-Santiago v. United Parcel Service, 524 F.3d 120, n.3 (1st Cir. 2008) (under Hall Street, "manifest disregard of the law is not a valid ground for vacating or modifying an arbitration award in cases brought under the Federal Arbitration Act"); Stolt-Nielsen SA v. Animalfeeds Int'l Corp., 548 F.3d 85 (2d Cir. 2008) (noting that the Hall Street court rejected manifest abuse of law as an entirely separate basis for vacatur); and Prime Therapeutics LCC v. Omnicare, Inc., 555 F. Supp. 2d 993, 999 (D. Minn. 2008) ("[D]oes [the decision in Hall Street] suggest that courts can no longer vacate an arbitration award based on judicially-created grounds such as manifest disregard of the law . . . this Court believes that the answer to this question is yes.").

Considering that the Third Circuit has recognized "complete irrationality" and "manifest disregard of the law" as separate common law grounds to vacate an award, this Court should deny the petition for arguing the incorrect standard of review. The Supreme Court decided Hall Street in March 2008. Accordingly, there is simply no excuse for the Frankos to have ignored this decision in the Memorandum. The absence of this decision only exemplifies the illegitimacy of their petition to vacate.

Assuming continued viability of judicially-created grounds for vacatur, the Frankos have not carried their burden to establish that the award was "completely irrational". See Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co., et. al, 868 F.2d 52 (3d Cir. 1989) (ex parte communications with arbitrator not sufficient to carry burden). Importantly, "a court may not reweigh the evidence under the guise of determining whether the Panel's decision was irrational. Nor does a review for 'irrationality' permit an inquiry into the sufficiency of the evidence supporting a decision." Edward Mellon, 2006 U.S. Dist. LEXIS at *22 (citations omitted). "[A] court cannot act as a legal screen to comb the record for technical errors in the receipt or

17

rejection of evidence by arbitrators, who in most cases are laymen." Id. at \*23 (potential arbitrator bias did not result in completely irrational award).  "An award will be deemed irrational and set aside if there is *no* evidence to support it. Id. at \*15 (citing NF&M Corp. v. United Steelworkers of America, 524 F.2d 756, 760 (3d Cir. 1975); H.K. Porter Co. v. United Saw File & Steel Product Workers of America, 333 F. 2d 596 (3d Cir. 1964)).  In other words, "an award is not irrational as long as there is *any* evidence to support it." Id. (citing Kane Gas Light & Heating Co. v. International Broth. Of Firemen and Oilers, Local 112, 687 F. 2d 673, 679 n. 8 (3d Cir. 1982)).  "[A]s long  as the record reveals 'some basis for the arbitrator's conclusion . . . . the inquiry is over'" Id. (quoting Tanoma Mining Co. v. Local Union No. 1269, 896 F.2d 745, 748 (3d Cir. 1990)).

With respect to manifest disregard of the law, the Frankos must prove more than mere legal error or misunderstanding.  See Sherrock Brothers, 2008 U.S. App. LEXIS at \*4 (citation omitted).  Rather, "the decision must fly in the face of clearly established legal precedent." Id. (emphasis added).  The Frankos have to establish that the Panel appreciated the existence of a clearly governing legal principle but decided to ignore or pay no attention to it. Id. (appellant failed meet this very high threshold); see also Tanoma Mining Co. v. Local Union No. 1269, 896 F. 2d 745, 749 (3d Cir. 1990) (no manifest disregard of the law – "Although the arbitrator's understanding of agency law was somewhat hazy, he was attempting to apply the legal principles as he understood them."); and Local Joint Executive Board of Las Vegas v. Riverboat Casino, Inc., et al., 817 F.2d 524, 528 (9th Cir. 1987) ("Even though 'the arbitrator's view of the law might be open to serious question . . . [an award] . . . will not be set aside by a court for error of either law or fact . . . if the award contains the honest decision of the arbitrators, after a full and fair hearing of the parties.").

1.    **The Award Was Rational**

Against the proper legal framework, the Frankos simply have not carried their burden because there is evidence to support the award.    Instead, the Frankos have, without any testimonial record support, primarily focused on one of the bases for the award (market performance caused any losses) to substantiate their irrationality argument and ask this Court to substitute its judgment for that of the Panel.    The Frankos have, understandably, glossed over the second basis; (i) the recommended investments were within the acceptable spectrum and quality; and (ii) the recommended investments were within the industry norm for the time and suitable to the Frankos' objectives as stated and/or acquiesced to by the Frankos in written form and/or by their actions on various occasions.    By failing to do so, the Frankos have ignored a wealth of evidence that supports the award, as detailed more fully below.

There was ample evidence that losses, if any, were due to market conditions.    The evidence demonstrated that there was tremendous market volatility from the spring of 2000 through the spring of 2003.    In fact, P&G common stock lost approximately one-half of its value on one day alone in March 2000.    In addition, the Frankos' account statements included warnings pertaining to market volatility and uncertainty through this time period.    In reaction to the market volatility, Mrs. Franko, in 2002, requested that Krugel make their investments more conservative by increasing their bonds and decreasing their equities.    Notwithstanding this tremendous stock market volatility, the Frankos, on their own, asked Krugel to purchase 1,000 additional shares of P&G common stock in February 2003.    Clearly, there was ample evidence of market factors driving account performance, as well as the fact that the Frankos understood and accepted the risks associate with market fluctuations.

The Frankos' suggestion that a one-hundred percent (100%) S&P 500 portfolio would have resulted in a gain as an additional basis to claim irrationality is irrational in and of itself. Mrs. Frankos' testimony established that the Frankos wanted a diversified portfolio to minimize their potential risk of loss, something they acknowledged that Krugel recommended.    The Frankos never invested in any one asset class before or after coming to Ameriprise Financial. After the Frankos moved their investments to Met Life, they maintained a 70/30 equity to bond and cash asset mix, which was more consistent with their stated preference in their Met Life account opening documents.    Moulden testified that a 100% S&P portfolio for the three year period of 2002 through 2005 would have represented twice as much risk than the portfolio the Frankos maintained with Ameriprise Financial.    Moulden also testified that the retrospective selection of an index that happened to perform better over the time that the Frankos invested with Ameriprise Financial was speculative in nature.    If the S&P 500 declined over 48% in this same time period, there is little doubt that the Frankos would not have touted the S&P 500 as the "well-managed" portfolio.

The Frankos' suggestion that the recommended investments were poor performers is also not supported by the record.[16]    The Frankos painted a tainted picture at the hearing regarding the Morningstar reports by only focusing on the performance of the respective funds within three months prior to Krugel's recommendations.    Krugel testified that, from an historical perspective, the recommended mutual funds were at or near top of their respective asset classes and had a longstanding and solid performance history, or were mirror-image funds of longstanding top performing mutual funds.    In addition, Krugel testified that, at the time, he had limited

---

[16]    In the Memorandum, the Frankos referenced Morningstar reports that were submitted into evidence.  If these documents were are so supportive of the Frankos' position, this Court must ask why the Frankos omitted them from the record.  The contention pertaining to "shelf-space" funds will be addressed *infra*.

investment options available to recommend and, as a result, recommended the best available funds in diverse asset classes. Krugel further testified that he independently researched all of the recommended investments before he made investment recommendations and only recommended those investments that he believed were best suited for the Frankos. Before the Frankos made any investments, Krugel reviewed his investment recommendations with them, including the nature of the investments, risks and performance history. Most important, Mrs. Franko confirmed that she approved all investment recommendations.

With respect to the "failure rate" in the literature, there was evidence to support the arbitrators' award. First, Moulden testified that the very same literature supported the Frankos' Ameriprise Financial average asset allocation; an asset allocation that was almost identical six months after the Frankos left Ameriprise Financial.[17]  Second, Krugel testified that the withdrawal rate was determined by the Frankos' initial requested withdrawal amount of $52,000.00. Third, the Frankos understood the amount of annual withdrawals until the end of the SEPP IRA restriction would be modified each year – up or down – depending upon the prior year-end value of their account. Krugel and Ameriprise Financial, the evidence showed, only recommended a portfolio based upon then available historical information that would take into account the Frankos' requested withdrawals over a twenty (20) year time horizon while, at the

---

[17]  The Frankos claim to have attached the "learned treatises" to the Memorandum, but they actually only attached two of the three articles. The Frankos omitted Claimants' Exhibit "67", which is attached hereto as Exhibit "S". During cross-examination, Moulden highlighted that the discussion of the relevant literature in Claimants' Exhibit "67" stated that an initial retirement portfolio for a retiree aged 60-65 should be **at least 75/25 equity to bonds and fixed investments**; Mr. Franko was 55 at the time that he retired. See Exhibit "T" at 118. Further, Moulden testified that this article explained that the available research emphasized the importance of equity dominated portfolios for sustainability of withdrawals over a long period of time. Id. The Frankos defined their investment time horizon as twenty (20) years. Accordingly, the very literature the Frankos used to cross-examine Moulden only supported the propriety of the investment recommendations.

same time, not deplete the Frankos' retirement assets. Based upon the entire record, the award was rational and it should be confirmed.

###           2.           There Was No Manifest Disregard Of The Law

The Frankos' recitation of the standard of review for manifest disregard of the law is ironic, at best. Specifically, the Frankos cited Jenkins v. Prudential-Bach Securities, Inc., 847 F.2d 631 (10th Cir. 1988), for the proposition that the manifest disregard analysis focuses on "willful inattentiveness to the governing law". The irony of this reference is that counsel for the Frankos stated in his October 6, 2008 letter to NASD Dispute Resolution that "**Claimants wish to thank the Panel for their attentiveness through more than twenty (20) hearings sessions** . . . " Exhibit "A". The question before this Court is how a panel can be attentive before issuing its reasoned award then become an "inattentive" panel for the purposes of the petition to vacate. The simple answer is that the "attentive" panel did not commit a manifest disregard of the law.

In the Memorandum, the Frankos make much of the fact that they submitted a pre-hearing memorandum and Ameriprise Financial did not. In doing so, the sum and substance of the Frankos' argument is that the law they cited provides for absolute liability without any meaningful regard to the evidence. First, the arbitrators left it to the *option* of the parties regarding submission of pre-hearing memoranda; Ameriprise Financial simply chose not to do so. Second, the arbitrators did make any finding that the law in the Frankos' pre-hearing memorandum controlled or constituted "law of the case". Third, the Memorandum fails to address whether the record evidence in conjunction with the applicable law constituted a manifest disregard of the law. By failing to do so, the Frankos have not carried their weighty burden; this Court should deny the petition to vacate and confirm the award.

a.    **The Frankos' Well-Managed Portfolio Theory**

If the well-managed portfolio theory were the controlling law, which the Frankos never demonstrated, the Frankos' argument suffers from a fatal flaw. The well-managed portfolio theory is a **damages theory only**. By failing to establish liability, there was nothing further for the arbitrators to consider. There could be no manifest disregard of the law because the Panel found no loss causation.

Even, Assuming *arguendo* that the Frankos established liability, the Frankos ignored the fact that the well-managed portfolio theory is one of a number of possible damage theories. For example, the court in Medical Associates v. Advest, Inc., 1998 U.S. Dist. LEXIS 11253 (June 30, 1989 W.D.N.Y.), as cited in the Memorandum, albeit not precedential, found that a successful plaintiff may recover non-speculative damages under three different methods: (i) out-of-pocket loss; (ii) benefit of the bargain; or (iii) some other appropriate standard. Id. at *4 (quoting Osofsky v. Zipf, 645 F.2d 107, 111 (2d Cir. 1981)). Even though the issue was not before the Advest court, the court suggested that the plaintiff's market indexing theory may have been too speculative to employ. Id. at n. 5.

The fact that the Frankos' counsel suggested a well-managed portfolio of 100% S&P 500 and presented evidence of the value of the Frankos' account under that scenario, as well as the scenario if the Frankos' invested 100% in P&G common stock, does not mean that the arbitrators manifestly disregarded the law. Importantly the Frankos never invested 100% in any one asset class; their well-managed portfolio represented pure speculation with the benefit of hindsight. In fact, Mrs. Franko repeatedly testified that the Frankos understood the need to diversify and the risks of failing to do so. Mrs. Franko also confirmed that Krugel advised the Frankos to diversify their assets. Further, Moulden testified that the Frankos' "well-managed portfolio" was

fundamentally flawed in its approach, speculative in nature, presented a portfolio allocation twice as risky as the one that they maintained with Ameriprise Financial, and that the Frankos sustained no out of pocket losses. The Frankos offered no evidence to rebut these points. Simply put, there was no manifest disregard of the law.

### b.    The Frankos' Claim Of Breach Of Fiduciary Duty

Although there is little dispute that a broker owes some form of a fiduciary duty to his/her/its clients, a claim for breach of fiduciary duty is not one of strict liability as the Frankos insinuate. The duties of a broker regarding clients who have a non-discretionary account, such as the Frankos, have been described as follows:

> (1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer.

Merrill Lynch, Pierce, Fenner & Smith v. Perelle, 514 A.2d 552, 561 (Pa. Super. 1986). The Frankos have not addressed any of these duties. Instead, they have simply painted with a broad brush and provided in summary fashion a couple of examples of what they perceive to represent "breaches of fiduciary duty". In the end, the arbitrators properly considered the law and the facts, necessarily concluding that the Frankos' version of the facts simply did not satisfy their burden of proof.

The Frankos first claim that Ameriprise Financial knowingly recommended mutual funds out of which Ameriprise Financial received undisclosed payments. First, the Frankos opted out of the class action referenced in the Memorandum and, as a result, had an independent obligation

to prove the facts associated with this claim. Krugel's uncontradicted testimony was that he was unaware of any purported arrangements pursuant to which Ameriprise Financial allegedly received any undisclosed fees and did not receive additional compensation with respect to certain mutual funds. Moreover, Krugel testified that he never received any warnings from Ameriprise Financial regarding any potential impact to his compensation or association with the company if he sold mutual funds that were not part of the alleged "shelf-space". Krugel further testified that not all of the funds he recommended were on the list of alleged "shelf-space" funds. In the end, Krugel testified that he only sold those funds available to him that he independently researched and tracked for all of his clients. Cyndy Potts-Morris, Krugel's registered principal, echoed Krugel's testimony.

Second, the class action settlement from <u>In re American Express Financial Advisors Litig.</u>, Civil Action No. 1-04-cv-1773 (S.D.N.Y.) ("In re AEFA"), which the Frankos reference but did not provide to this Court, clearly states that it was without any admission of liability and shall not be used as evidence against Ameriprise Financial in any other civil proceeding. <u>See</u> Exhibit "U" at ¶ 53. The Frankos suggestion that an inadmissible settlement that contains no admission of liability somehow controls the disposition of the Frankos' claim, where they opted out from the class, is simply not supportable as a matter of law and further suggests that the Frankos' lacked a legitimate basis in pursuing their petition to vacate.

Third, the class period in <u>In re AEFA</u> covered 1999-2006. Importantly, the Frankos investments with Krugel and Ameriprise Financial of the purported "shelf-space funds" occurred in 1997 and 1998. As a result, the "shelf-space" claims were unrelated to the Frankos' claims.

The arbitrators properly concluded that the Frankos simply could not and did not carry their burden with respect to this claim.[18]

The Frankos next claim that Krugel/Ameriprise Financial failed to study, analyze and/or otherwise become informed as to the nature, price and/or financial prognosis of the mutual funds that the Frankos purchased. Notwithstanding the Frankos' conclusory statements, Krugel testified that, before making any investment recommendations to the Frankos, he conducted his own research of the mutual funds that were available to him to find those funds in different asset classes that were best suited for his clients. He followed certain mutual funds over the years and added or removed funds from his list of recommended funds, depending on whether those funds fell within the criteria that he set. Once Krugel developed his list of mutual funds across asset classes, he recommended those funds to his clients, including the Frankos. When Krugel made pre-investment recommendations to the Frankos, he reviewed each recommended investment with them, including the nature of the investments, as well as performance history, potential benefits and risks before any investments were made.

From a historical perspective, all of the mutual funds that Krugel recommended had solid long-term performance records and were at or near the top of their asset class. Alternatively, Krugel recommended mutual funds that were a mirror image of long-standing solidly performing mutual funds. Separately, the asset allocation models that the Frankos received and reviewed independently and/or with Krugel, provided a plain English description of each investment recommendation, including risks. The Frankos also received prospectuses for each mutual funds that Mrs. Franko tried to review. The Frankos admittedly never raised any questions or concerns

---

[18] In the Memorandum, the Frankos referenced other claims involving Krugel. The fact that Krugel may have been subject to other claims did not relieve the Frankos from their burden of proof. The Frankos' counsel brought five of the claims identified in the Memorandum.

with Krugel about any of the investment recommendations. According to Mrs. Franko, she approved the investment recommendations.

The Frankos also claim that Ameriprise Financial failed to warn them of the failure rate associated with a 8.5% withdrawal rate. As a preliminary matter, counsel for the Frankos only explored the issue of "failure rates" with Moulden, the expert witness for Ameriprise Financial, not Krugel. Moulden testified that the literature the Frankos used in cross-examination supported the average asset allocation that the Frankos maintained with Ameriprise Financial. Further, Krugel testified that the withdrawal rate was based upon the amount of money that the Frankos originally requested on an annual basis. Krugel simply built a recommended portfolio based upon the Frankos' long-term objectives and requested yearly withdrawals.

The Frankos next suggest that Ameriprise Financial somehow breached its fiduciary duty by offering specific rates of return. As an initial matter, Ameriprise Financial made no guarantee and did not "offer" rates of return. Specifically, the **projected** rates of return in the asset allocation models constitute mere projections, with no guarantee of future results. Mrs. Franko testified over and over again that Krugel only gave her projections, neither he nor anyone else guaranteed anything. Finally, Mrs. Franko acknowledged that she understood how the Efficient Frontier diagram on the asset allocation worked; as the rate of return increased, the potential risk of loss increased. See, e.g., Exhibit "F" at 3. As a result, the evidence showed that the Frankos were, at all times, fully aware of and appreciated the potential risk of loss associated with the **projected** rates of return.

Finally, the Frankos suggest that prior regulatory findings regarding Ameriprise Financial mean that Ameriprise Financial breached its fiduciary duty to the Frankos. Putting aside the regulatory findings, the Frankos still had to prove that Ameriprise Financial engaged in the same

conduct with respect to the Frankos.  As set forth above, there was ample evidence that Ameriprise Financial fulfilled whatever fiduciary duty it may have had to the Frankos.  The arbitrators properly found that the Frankos could not sustain their burden on the breach of fiduciary duty claim.

**c.    The Frankos' Claim For Violation Of The
Unfair Trade Practices And Consumer Protection Law**

The Frankos contend that the arbitrators manifestly disregarded the law pertaining to the Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  Ameriprise Financial does not dispute that the law within this circuit suggests that the "fraudulent provision of investment services" may fall with the scope of the UTPCPL.  See Algrant v. Evergreen Valley Nurseries Ltd. Partnership, 126 F.2d 187 (3d. Cir. 1997).  Even so, the most important factor is "fraudulent conduct", which the Frankos failed to show.  The Pennsylvania Supreme Court in Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001), made it abundantly clear that a claim under the UTPCPL still required the Frankos to prove the common law fraud requirements of justifiable reliance upon the alleged deceptive practice and causation.  Id.; see also Toy v. Metropolitan Life Ins. Co., 863 A.2d 1, 21 (Pa. Super. 2004) (finding plaintiff under UTPCPL must demonstrate justifiable reliance on misrepresentation or wrongful conduct).

With respect to the Frankos' UTPCPL claim, this Court need go no further than Mrs. Frankos' forthright testimony that no one lied, misrepresented or hid anything from the Frankos.  When asked if he agreed with his wife's testimony, Mr. Franko stated that he did.  Simply put, the Frankos have no UTPCPL claim because the Frankos acknowledged that there were no misrepresentations and, therefore, no justifiable reliance on any purported misrepresentation.

The arbitrators fully appreciated the applicable law and simply concluded that the Frankos did

not satisfy their burden of proof.[19]

**B.     Ameriprise Financial Is Entitled To Sanctions**

The court in B.L. Harbett International, LLC v. Hercules Steel Co., 441 F.3d 905, 906

and 913 (11th Cir. 2006), most accurately captured the essence of the problem with the Frankos'

petition when it stated:

> The laudatory goals of the FAA [Federal Arbitration Act] will be
> achieved only to the extent that courts ensure arbitration is an
> alternative to litigation, not an additional layer in a protracted
> contest.  If we permit parties who lose in arbitration to freely
> relitigate their cases in court, arbitration will do nothing to reduce
> congestion in the judicial system; dispute resolution will be slower
> instead of faster; and reaching a final decision will cost more
> instead of less.  This case is a good example of the poor loser
> problem and it provides us with an opportunity to discuss a
> potential solution.
>
> * * * *
>
> When a party who loses an arbitration award assumes a never-say-
> die attitude and drags the dispute through the court system without
> objectively reasonable belief it will prevail, the promise of
> arbitration is broken.  Arbitration's allure is dependent upon the
> arbitrator being the last decision maker in all but the most unusual
> cases.  The more cases there are, like this one, in which the
> arbitrator is only the first stop along the way, the less arbitration
> will be.  If arbitration is to be a meaningful alternative to litigation,
> the parties must be able to trust that the arbitrator's decision will be
> honored sooner than later.

As the "potential solution", the Halbert court suggested that sanctions may be appropriate where

a petition to vacate is pursued without a legitimate basis. Id. at 913.

The Frankos filed their petition to vacate without a legitimate basis because: (i) they

failed to provide the Court with any testimonial record despite their weighty burden of proof; (ii)

---

[19]   In the Memorandum, the Frankos identified what they characterized as *per se* deceptive conduct.  The Frankos
provided no legal support for their proffered *per se* deceptive conduct, further exemplifying the lack of a legitimate
basis to the petition to vacate.

they failed to provide the Court with all exhibits identified in their Memorandum; and (iii) they failed to address the proper standard of review under the FAA.  By pursuing their petition without a legitimate basis, the Frankos have wasted the Court's time and Ameriprise Financial's resources.  Accordingly, Ameriprise Financial should be award sanctions, including its attorneys' fees and costs incurred in response to the petition.

## IV.    CONCLUSION

For the reasons set forth more fully above, respondent, Ameriprise Financial Services, Inc., respectfully requests that this Court deny the petition to vacate and confirm the arbitration award.  The Frankos have simply failed to carry their burden of proof to vacate the arbitration award, just like they failed to carry their burden of proof during the arbitration.  Moreover, by filing the petition to vacate without requesting the testimonial record and supplying that record to this Court, coupled with the fact that the Frankos did not address the proper standard of review, demonstrates that the Frankos filed their petition to vacate without a legitimate basis, entitling Ameriprise Financial to sanctions, including its attorney's fees and costs expended in defense of the petition to vacate.

Respectfully submitted,

By: /s/jh349
Joshua Horn, Esquire
Fox Rothschild LLP
2000 Market Street, Tenth Floor
Philadelphia, PA  19103
Telephone:  (215) 299-2184
Telecopier:  (215) 299-2150
Attorneys for Respondent
Ameriprise Financial Services, Inc.

Dated: April 1, 2009

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH A. FRANKO, JR.                          :     CIVIL ACTION NO. 09-CV-09
JUDITH A. FRANKO, his wife,                    :
                                   :     Judge Padova
             Petitioners,          :
                                     :
             v.                   :
                                       :
AMERIPRISE FINANCIAL SERVICES, INC.            :
f/k/a AMERICAN EXPRESS FINANCIAL               :
ADVISORS, INC.,                                :
                                     :
             Respondent.           :

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing memorandum of law in opposition to the motion to vacate, with accompanying exhibits, were served upon the following via United States First Class Mail, postage prepaid:

> Nicholas J. Guiliano, Esquire
> The Guiliano Law Firm, .C.
> 230 South Broad Street, Suite 601
> Philadelphia, PA  19102
>
> Attorneys for Petitioners

> /s/jh349
> JOSHUA HORN, ESQUIRE

Dated:  April 1, 2009